CAROLINE NOVACK et al., Appellants, v STATE OF NEW YORK et al., Respondents. (Claim No. 55287.)

Third Department, February 23, 1978

### APPEARANCES OF COUNSEL

*David Marcus (David D. Birk* of counsel), for appellants.

*Louis J. Lefkowitz, Attorney-General (Vernon Stuart* and *Ruth Kessler Toch* of counsel), for respondents.

### OPINION OF THE COURT

MAHONEY, P. J.

Claimants owned some 123 acres of land along either side of Drury Lane (which runs north and south) in the Towns of New Windsor and Newburgh, Orange County. There were a

large house and accessory buildings along the west side of the road, but otherwise the 123 acres were unimproved.

The State, on August 13, 1971, took the claimants' entire holdings. The Court of Claims valued the house and surrounding three acres at $47,000. This aspect of the award is not challenged on appeal. The court found all the remaining 120 acres to be worth $2,000 per acre, even though the zoning of this remainder was not uniform. Twelve acres were zoned "R-3" (one- or two-family residences), and 108 acres were zoned "light manufacturing" or "general industrial" (office and light manufacturing or general industrial uses). Residences were permitted as of right throughout the entire 120 acres.[1]

The claimants' primary argument on this appeal is that because of the inconsistent assumptions by the real estate appraisers as to the highest and best use of the 120 acres, there was no range of testimony (see *Waxman v State of New York,* 57 AD2d 244, 247; *Foothills Corp. v State of New York,* 50 AD2d 986, 987). Absent such a range, the court was obliged to accept one expert's opinion or explain any departure *(Waxman v State of New York, supra; Weiner v State of New York,* 48 AD2d 440, 441-442; *Conklin v State of New York,* 22 AD2d 481; cf. *Matter of City of New York [A. & W. Realty Corp.],* 1 NY2d 428). The court did not fully adopt either appraisal and, in claimants' view, made no adequate explanation.

Claimants' expert thought that the highest and best use of the 120 acres was reflected in the zoning. That is, the 12 acres zoned "R-3" (one- and two-family dwellings) were best suited for residential development while the remaining 108 acres, zoned "office and light manufacturing" and "general industrial", should be evaluated as land with potential for commercial development. The State's appraiser thought the 120 acres would best be developed for residences. Residential use was permitted in each zone.

The Court of Claims found the highest and best use to be "industrial as zoned and residential as zoned, with the qualification that the industrial zoned areas could still be used for residential or agricultural purposes and with the further qualification that the determination of fair market value of all claimants' land * * * would still depend upon [comparable sales]." The court also stated the industrial development which had occurred in the vicinity had been along Route 17K,

---

1. In fact, the claimants' house was located in the "general industrial" zone.

notably the Tour Industrial Park at the intersection of Drury Lane and Route 17K (nearly a mile north of the subject property). Since there was no such development on Drury Lane and there was abundant industrially-zoned undeveloped land in locations similar to the subject, the court implicitly held that the zoning of the various alleged comparable sales was not important and the highest and best use was uncertain.

These conclusions are strongly supported by the evidence. The zoning lines, although permitting commercial uses on parts of the tract, were drawn on a rural setting with no great precision.[2] Moreover, residential development was permitted throughout. The court was certainly not constrained to accept claimants' appraiser's hypothesis that the 123 acres would likely be developed piecemeal, i.e., three acres to accommodate the existing frame house, 12 acres to be developed as a residential subdivision, and 108 acres to be sold to businesses for such uses as truck terminals.

■ Given the uncertain highest and best use, the court properly concluded that the best measure of the market value of the property was sales of land comparable in location and quality for general development or speculation. Therefore, it selected sales from both those offered by the claimants and the State.

Of the four comparable sales offered by claimants, Nos. 2 and 3 were rejected since fronting on Route 17K, which claimants' own expert, Harold Kahn, admitted was a much more desirable location than Drury Lane. Sale No. 4 was rejected as being too far from the subject.[3]

Sale No. 1 was accepted as comparable by the court; however, the adjustments made by claimants' appraiser were rejected. This unimproved land, similar in size and topography to the subject, was on North Drury Lane[4] and closer to the intersection with 17K than the subject. Before adjustment, sale No. 1 indicated a market value of $2,500 per acre.

2. The lack of precision is reflected by the only structure on the 123-acre tract, a large colonial house, being entirely within the area zoned for general industrial development.

3. It could also have been disregarded since it immediately adjoined an interchange with Interstate Route 84. The subject property was some two miles from the nearest Route 84 interchange.

4. The taken property was nearly a mile south of 17K. North Drury Lane is the extension of Drury Lane north of 17K.

Claimants' appraiser inflated this figure by some 50% to $3,800 per acre because he thought the taken land enjoyed superior "utility" and "location". To justify the "utility" adjustment, claimants pointed to the New York City aqueduct which supposedly cut off a large portion of sale No. 1 from access. Upon questioning by the court, however, it was revealed the aqueduct was completely buried and the landowner had the right to cross it. As for the "location" adjustment, claimants' appraiser thought frontage on North Drury Lane was inferior since it was a town rather than, as Drury Lane, a county road. This is certainly not a compelling factor, and, in any event, sale No. 1's desirable proximity to 17K would more than balance it off. There is thus ample support in the record to use the unadjusted sale value of $2,500 per acre.

The court selected the State's comparable sales L-5 and L-6 for further guidance. Sale L-5 was of 54 acres of unimproved land near the subject on Drury Lane. The sale price indicated a per acre value of $1,500. Claimants object to the use of this sale since it was never consummated. The State condemned the land before title was conveyed. From all that appears, the contract was in good faith and at arm's length.

█ Claimants assert that since section 16 of the Court of Claims Act allows consideration of the price "upon any sale" of comparable realty and since a frustrated contract is not a full-fledged "sale", the statute implicitly prohibits consideration of the contract price. The cases cited in support of this interpretation (B. P. Oil Corp. v State of New York, 52 AD2d 1033; Matter of Simmons, 68 Misc 65) are obviously distinguishable. Furthermore, such a restriction on comparable sale evidence would be ill-founded. The contract price designated as sale L-5 was more than an offer. It was an enforceable commitment. The intervention by the State in no way impeaches the reliability of the price as evidence of market value.

Although the rule in some States may be to exclude such unconsummated sales (see 5 Nichols, Eminent Domain [3d ed], § 21.4, subd [3], pp 21-131, 21-132),[5] there is well-reasoned

___

5. The treatise in part supports its assertion that unconsummated sales are inadmissible by citing Matter of Simmons (68 Misc 65). As noted earlier, Simmons does not support this view. In that case the decedent—prior owner of the property being evaluated—agreed in a written contract to sell at a particular price. The court refused to allow in the contract price because, as the seller was dead, there was no way to be sure the contract price reflected the entire consideration.

authority admitting such evidence where the contract was in good faith and free from complicating conditions (see *State Roads Comm. v Wyvill,* 244 Md 163, quoted in Nichols, *supra,* p 21-132). There is no New York authority excluding contract prices of comparable land, and the rule is established here that the good faith contract price of the *taken* property is admissible even though such contract is frustrated by a taking or other interference *(Matter of City of New York [Hamilton Place],* 67 Misc 191, app dsmd 143 App Div 302, affd 202 NY 607; *Matter of County of Nassau [Searingtown Rd.],* 68 Misc 2d 405). The L-5 contract price was properly received.

Sale L-6 indicated an unadjusted value of $1,500 per acre. The land was on a nearby secondary road similar to Drury Lane except it was a dead end. The State's appraiser admitted that its limited highway access would impair its value for industrial uses, but thought the secluded location would be satisfactory for residential development.

Noting the range of the three comparable sales as $1,500 per acre to $2,500 per acre, the court estimated the value of the unimproved 120 acres at $2,000 per acre or $240,000. A simple averaging would have produced a lower award, so absent a cross appeal it is not necessary to decide if the method of weighing the sales used by the court was correct.

The judgment should be affirmed, with costs.

GREENBLOTT, MAIN, MIKOLL and HERLIHY, JJ., concur.

Judgment affirmed, with costs.