*44 Burke, J.
These proceedings involve the valuation of cemetery property.
The claimant has appealed from an order of the Appellate Division reducing the award of the Court of Claims from $14,557 to $10,752 for the appropriation of .652 acres of land and affirming an award of $5,000 for consequential damage resulting from the condemnation of the remaining frontage on the only direct access road to the cemetery. The case of the State of New York is similar in all respects to the companion case involving .942 acres appropriated for use of the Power Authority, except the State appropriation took place two years later, was of land to the north of the original taking, and deprived claimant of its remaining frontage on Military Road —the only direct access road to the cemetery. In the case of the Power Authority the Appellate Division reduced the award from $19,898 to $14,269.
In their cross appeals, the claimant seeks a reinstatement of the judgments of the Court of Claims, while the respondents ask *45 for additional reductions in the awards. The Appellate Division in reducing the awards held that an Inwood factor reflecting a 6% rate of return should have been employed rather than one reflecting a á% rate of return which the Court of Claims employed.
The court below has affirmed the findings of fact of the Court of Claims: (1) that the highest and best available use was for cemetery purposes; (2) that, since the development of the appropriated land was imminent at the time of the taking, graves would be sold in the appropriated area throughout the entire period of years needed to sell the entire unsold number of grave sites; and (3) that the basic figures which were found by the Court of Claims based upon past experience of the cemetery were supported by the evidence in the record.
The respondents make four contentions: (I) that the highest and best available use be considered use for residential purposes ; (II) that, assuming it should be valued for cemetery purposes, the Court of Claims erred in finding that the period in which the appropriated land would be sold was during a period of 55 and 61 years rather than at a time after the end of each period and also.erred in the method of computing net income from the sales of graves; (III) that, assuming the court below was correct in holding the best available use to be for cemetery purposes, it nevertheless erred in employing an Inwood factor reflecting a 6% rate of return rather than one based on a higher rate of return; and (IV) that claimant is not entitled to consequential damage for complete loss of access to Military Road.
Since the arguments of neither the claimant nor the respondents are persuasive we agree with the determination of the Appellate Division.
Before we deal with the question of whether the Appellate Division had a logical basis for fixing the allowable rate of return at 6%, a brief consideration of the evidence will suffice to show the principal questions are factual in nature and that no rule of law had been violated.
A tract of which claimant’s property formed a part had been dedicated to use as a cemetery since 1897. The area appropriated was part of about 28 acres which since 1942 had been operated by claimant, Diocese of Buffalo, as the Gate of Heaven Cemetery. The cemetery was bordered on the north and south *46 by two other cemeteries. The cemetery to the north is known as Holy Trinity; the cemetery to the south, Riverdale Cemetery. Holy Trinity and Riverdale border on Lewiston Road to the west. Claimant’s cemetery does not, bnt has access to Lewiston Road by an easement throngh Riverdale Cemetery. All three extended on the east to Military JRoacl. The portion of claimant’s cemetery appropriated was the easternmost part bordering' on Military Road.
Even if we leave aside for the moment the question of when the appropriated land might be utilized for cemetery purposes, the fact remains that these parcels, virtually surrounded by cemetery land, would certainly have no market for residential purposes. As to when the appropriated land would be utilized, a witness for the claimant testified and the trial court found that it was the intent of the claimant to develop the tract from Military Road and that ‘ ‘ plans for the development of the appropriated area were initiated in 1954.” During the trial it was shown that Holy Trinity, bordering Gate of Heaven on the north, had developed an area and sold graves on the westerly end and in the middle and had then opened an entrance on the east at Military Road and had developed this area before the rest of the cemetery was sold out. This finding effectively disposes of the respondents’ assumption that the appropriated area would be used up last.
As to the method used to compute net income from the sale of graves, a witness for the respondent Power Authority testified that graves had been laid out at the rate of 996 graves to the acre. Therefore, he concluded the appropriated parcel of .942 acres would accommodate 938 graves which would be lost by reason of the taking. This was found by the trial court and affirmed by the Appellate Division.
In addition evidence was adduced as to the gross sales price per grave, the expense of sale, the cost of development of the cemetery land per acre and the cost of maintenance per acre. Based on this evidence the Court of Claims made findings which have been affirmed. The Court of Claims, respondent now asserts, neglected to deduct a $3,977 development cost at the beginning of the 61-year period, to consider interest on $13,175 in maintenance costs and the full cost of ‘ ‘ perpetual maintenance. ” The answer to these assertions (as respondents concede *47 in. their brief) is that it is not a normal cemetery management practice to develop all of the undeveloped areas at once. Thus funding such an expense is not necessary. This is equally true of the care fund. Such a fund does not necessarily have to he set up at the very beginning of the 61-year period. Indeed the expert for the Power Authority followed the same method as the Court of Claims. He took the gross proceeds from the sales of graves in the appropriated area and deducted the cost of development and perpetual care. Lastly the deduction for the care fund is adequate as it meets the obligation of this cemetery under the cemetery law then in effect. The respondents would have this court impose an obligation on this cemetery in regard to care from which the Legislature has specifically exempted it.
Turning to the so-called “ Inwood ” factor we do not think a further modification is warranted. Here the court has stated an Inwood coefficient different from that given by the experts. The expert for the claimant said the percentage should be 3%%. Witnesses for the State and the Authority said it should be between 12% and 15%. The Court of Claims selected 4%. The Appellate Division modified by using an Inwood coefficient of 6%. The decision as to what rate would be sufficient to arrive at the full and fair damage award is for the trial court or the Appellate Division, not the expert witnesses. (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41.) The Appellate Division, after considering the experts’ recommendations on the rate of return, thought that the claimant could prudently invest at 6%. There is no doubt that beyond 6% an investment would tend to be less conservative. In the quest for the ‘ ‘ highest and best use ” value there is merit in the argument that, where property of a well-established cemetery with .steady patronage has been appropriated, the loss is in fact greater than that in the case of a new cemetery and the cemetery owners are to be compensated accordingly. A new or commercial cemetery has a selling force and advertising program. Date of Heaven Cemetery operated with no sales force and no selling program. Hence there were sufficient reasons for the Appellate Division to adopt an Inwood coefficient of 6%, and we perceive no reason to upset this finding.
In arriving at the value the courts below have considered all the testimony given by the witnesses and have not applied any *48 erroneous principles of law. It would at tlie least be speculative for us to impose our own views of economics in place of those adopted by the Appellate Division and we do not think we should do so.
The orders of the Appellate Division should be affirmed, without costs.